**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| DIAMOND OFFSHORE SERVICES CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-06-001 |
| | § | |
| GULFMARK OFFSHORE, INC. and | § | |
| GULFMARINE S.M. DO BRASIL, LTDA., | § | |
| | § | |
| Defendants. | | |

## ORDER DENYING DEFENDANT GULFMARINE S.M. DO BRASIL'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, INSUFFICIENT SERVICE OF PROCESS, AND FORUM NON CONVENIENS, AND DENYING DEFENDANT GULFMARK OFFSHORE, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND MOTION FOR SUMMARY JUDGMENT

Plaintiff Diamond Offshore Services Co. ("Diamond Offshore") brings this action against Defendant GulfMark Offshore, Inc. ("GulfMark") and GulfMarine S.M. Do Brasil, LTDA. ("Do Brasil") alleging that the OSV HIGHLAND WARRIOR, a vessel allegedly owned or operated by Do Brasil, allided with the MODU OCEAN WINNER, a vessel owned by Diamond Offshore, and caused substantial damage. Diamond Offshore claims that the damages are the direct result of negligent acts and omissions of Do Brasil and the alleged unseaworthy condition of the OSV HIGHLAND WARRIOR. GulfMark and Do Brasil filed their Amended Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Process Pursuant to Rules 12(b)(2) & (5) and Forum Non Conveniens ("Jurisdictional Motion"), and Diamond Offshore filed a timely Response thereto. GulfMark filed a Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6) and Motion for Summary Judgment, and Diamond Offshore filed a timely Response thereto. Diamond Offshore included a

Motion to Strike Dismissal Evidence, namely the unsworn declaration of Gulfmark Chief Operating Officer Bruce Streeter ("Streeter Declaration"), in its Response to the Jurisdictional Motion. GulfMark and Do Brasil filed timely Replies to both Responses.  In the Reply to the Jurisdictional Motion, GulfMark and Do Brasil responded to Diamond Offshore's Motion to Strike the Streeter Declaration.  Diamond Offshore filed a Surreply to the Reply to the Jurisdictional Motion, which included a Supplemental Motion to Strike Dismissal Evidence, namely the unsworn declaration of Do Brasil Administrative Manager Mario Sarrico Madalena ("Madalena Declaration").  Finally, GulfMarine and Do Brasil filed a Response to Plaintiff's Sur-Replies and Supplemental Motion to Strike Evidence. For the reasons stated below, GulfMark's Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6) and Motion for Summary Judgment are **DENIED**.  GulfMark and Do Brasil's Motion to Dismiss for Lack of Personal Jurisdiction, Motion to Dismiss for Lack of Service of Process, and Motion to Dismiss for Forum Non Conveniens are **DENIED**. Diamond Offshore's Motions to Strike Summary Judgment Evidence are **GRANTED IN PART AND DENIED IN PART**.[1]

## I. Background

This lawsuit arises out of the collision of two foreign flagged vessels in waters offshore Brazil that occurred on July 6, 2005.  Diamond Offshore claims that its drilling rig, the MODU OCEAN WINNER, was offloading pipe when the OSV HIGHLAND WARRIOR lost its position and allided with the port aft stability column of the MODU OCEAN WINNER.  The MODU OCEAN WINNER was operating under a contract with a government owned Brazilian oil company, Petroleo Brasileiro,

---

[1]The Court does not consider this Order worthy of publication.  Accordingly, it has not requested and does not authorize publication.

S.A., which had contracted with Superpesa Cia. De Transportes Especias e Intermodais ("Superpesa") to provide support vessel services to the MODU OCEAN WINNER.  Superpesa chartered the OSV HIGHLAND WARRIOR to perform said services.  The OSV HIGHLAND WARRIOR was managed by Defendant Do Brasil.

Defendant GulfMark is a Delaware corporation with its principal place of business in Houston, Texas.  GulfMark owned Do Brasil directly and indirectly through subsidiaries in July 2005. GulfMark claims that it has no connection to Diamond Offshore and should not be a Party to this litigation.  Diamond Offshore claims that GulfMark is a proper Party because GulfMark and Do Brasil, in reality, constitute a single business entity, or that GulfMark is Do Brasil's alter ego.

Do Brasil claims it was not properly served and, as such, the case against it should be dismissed.  Additionally, Do Brasil claims that it has no connection with the United States and that this Court either has no jurisdiction over it or the forum is inconvenient.  Diamond Offshore's answers to Do Brasil's jurisdictional argument mainly derive from its theory that GulfMark and Do Brasil are a single business entity.  As such, the Court will address those issues together.  The Court first turns, though, to the allegations that Do Brasil was improperly served.

## II. Improper Service

Do Brasil moves for dismissal of this action due to insufficient service of process.  Diamond Offshore contends that it served Do Brasil through GulfMark's Houston office, and, citing Fed. R. of Civ. P. 4(f), claims that such service was "reasonably calculated to give notice."  Do Brasil claims Diamond Offshore was required to serve it under the terms outlined in the Inter-American Convention on Letters Rogatory (hereinafter "the Convention"), Jan. 30, 1975, S. TREATY DOC. No. 27 (1984), and the Additional Protocol to the Convention, which Do Brasil contends requires a plaintiff to

3

employ Letters Rogatory to obtain sufficient service of process.

The Convention "solely govern[s] the delivery of rogatory among the signatory States," and does not "supplant all alternative methods of service." *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 640 (5th Cir. 1994). In *Kreimerman*, the defendants were Walter Veerkamp, a resident of Mexico, and Casa Veerkamp, S.A. de C.V., a business with its principal place of business in Mexico. The plaintiff served the Mexican defendants through the Texas Secretary of State under the Texas Long-Arm Statute. *Id.* at 636. The defendants moved to dismiss the action due to improper service, and the district court granted the motion, reasoning that the plaintiffs must serve defendants residing in a signatory state with letters rogatory under the terms of the Convention. *Id.* at 637. The Fifth Circuit reversed, contrasting the language in the Convention, which states it "'shall apply to letters rogatory,'" to the language in the Hague Service Convention, which applies to "'*all cases*, in civil or commercial matters, *where there is occasion to transmit a judicial . . . document for service abroad*.'" *Id.* at 639; The Convention, art. 2; Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, art. 1, 20 U.S.T. 361, T.I.A.S. No. 6638. Thus, the Fifth Circuit held that the Convention "merely provides a mechanism for transmitting and delivering letters rogatory when and if parties elect to use that mechanism." *Kreimerman*, 22 F.3d at 642.

In the instant case, Diamond Offshore elected not to use letters rogatory. Instead, it allegedly served Do Brasil through GulfMark, its parent corporation. Diamond Offshore asserts that such service was "reasonably calculated to give notice," and thus, in compliance with Rule 4(f) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 4(f)(2). GulfMark and Do Brasil counter first that Diamond Offshore erroneously relied upon Rule 4(f)(2) because Rule 4(f)(2) only allows service

"reasonably calculated to give notice" when "there is no internationally agreed means of service or the applicable international agreement allows other means of service." *Id.* They contend that the Convention does not allow other means of service. However, as stated above, the Fifth Circuit explicitly stated that the Convention does not require service by letters rogatory. Thus, Diamond Offshore could reasonably rely on Rule 4(f)(2) to serve Do Brasil, and the Motion to Dismiss for Insufficient Service is **DENIED**.

## III.  Declarations

Diamond Offshore claims that GulfMark and Do Brasil are supporting their Motions with two Declarations that (1) contain conclusory allegations of ultimate factual and legal determinations, and (2) are contradicted by later deposition testimony. Diamond Offshore is specifically opposed to the Streeter Declaration and the Madalena Declaration. Diamond Offshore requests that the Declarations be stricken, or, alternatively, be disregarded as unreliable and insufficient evidence. The Court has reviewed the Record and finds that, while some of the statements in the later deposition testimony could be construed as contradictory, they are not completely irreconcilable. Furthermore,

> [A] witness' affidavit will not be automatically excluded because it conflicts with the witness' earlier or later deposition, despite the greater weight usually attributed to the deposition. The court may, however, consider whether the conflict creates a credibility issue preventing summary judgment from being entered.

10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 8 *Federal Practice & Procedure* § 2738, at 334–35 (3d ed. 1998).

The statements that Diamond Offshore contends are conclusory allegations of ultimate factual and legal determinations are generally about the structure of the two businesses. For instance, Streeter claims that GulfMark and Do Brasil have separate headquarters, do not share common officers or

directors, and have not commingled assets.  These are not the type of conclusory statements that render an affidavit meaningless as summary judgment evidence. *See Orthopedic & Sports Injury Clinic v. Wang*, 922 F.2d 220, 224 (5th Cir. 1991) ("[T]here is a level of conclusoriness below which an affidavit must not sink if it is to provide the basis for a genuine issue of material fact."); *id.* at 225 (finding that an expert who opined in his affidavit that the defendant was grossly negligent, without distinguishing between simple and gross negligence, had  sunk below that level); *Broadway v. City of Montgomery*, 530 F.2d 657, 660 & n.5 (5th Cir. 1976) (finding an affidavit from an attorney indicating that his client "ha[s] evidence which tends to show that Defendants . . . conspired to commit the acts complained of by Plaintiffs" was conclusory).  Thus, the Court will not entirely disregard the Declarations.

However, the Court finds the Streeter Declaration may not be used as evidence for the Motion for Summary Judgment.  Rule 56(e)  requires that affidavits be "made on personal knowledge." Fed. R. Civ. P. 56(e).  Streeter testified that, while he reviewed the material in his declaration before signing it, he did not prepare the affidavit, and he did not review statements or records to verify their accuracy. (Streeter Decl. at 20–21.)  Thus, there is some evidence that Streeter did not actually make the declaration on "personal knowledge."  Therefore, the Court, in an abundance of caution and in order to draw all inferences in favor of the plaintiff, will not use the Streeter Declaration as evidence for the Motion for Summary Judgment.  Diamond Offshore has not pointed to similar testimony regarding the Madalena Declaration, so the Court will not disregard it when considering the Motion for Summary Judgment.  Both Declarations are admissible for the other Motions currently before the

6

Court.[2]  In accordance with the above discussion, Diamond Offshore's Motions to Strike the Streeter

Declaration and the Madalena Declaration or, alternatively, disregard as unreliable and insufficient

evidence, is hereby **GRANTED IN PART AND DENIED IN PART**.

### IV.  Motion to Dismiss Pursuant to Rule 12(b)(6), Motion for Summary Judgment, and Motion to Dismiss for Lack of Personal Jurisdiction

Do Brasil requests that the Court dismiss the claim against it for lack of personal jurisdiction,

and GulfMark requests that the Court dismiss the claim against it for failure to state a claim under

Rule 12(b)(6) or that the Court grant summary judgment in its favor.  Each of these motions hinge

on the actual relationship between Do Brasil and GulfMark, so, after the Court discusses the legal

standard for each claim, it will explore that relationship before turning to the analysis of the three

motions.

### A.  Legal Standard

#### 1.  Rule 12(b)(6)

A party is entitled to dismissal under FED. R. CIV. P. 12(b)(6) when an opposing party fails

to state a claim upon which relief may be granted.  Rule 12(b)(6) dismissal is appropriate when it

appears without a doubt that the plaintiff can prove no set of facts in support of his claims that would

entitle him to relief.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992, 998, 152

L. Ed. 2d 1 (2002); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957);

*Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).  When considering a

motion to dismiss for failure to state a claim, the Court accepts as true all well-pleaded allegations

in the complaint, and views them in the light most favorable to the plaintiff.  *See Scanlan v. Texas*

---

[2]However, the Court construes any conflicts in favor of the plaintiff in its personal jurisdiction inquiry.  *See Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784, 785 (5th Cir. 1990).

*A&M University*, 343 F.3d 533, 536 (5th Cir. 2003); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (noting that a court must construe the complaint liberally in favor of the plaintiff); *see also Malina v. Gonzales*, 994 F.2d 1121, 1125 (5th Cir. 1993). "A motion to dismiss under Rule 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Collins*, 224 F.3d at 498 (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982).

Although all doubts are resolved in the plaintiff's favor, a plaintiff still must plead specific facts to avoid dismissal for failure to state a claim; a court may not accept as true conclusory allegations or unwarranted deductions of fact contained within the plaintiff's complaint. *See Tuchman*, 14 F.3d at 1067; *Fernandez-Montez v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). "'[A] statement of facts that merely creates a suspicion that the pleader might have a right of action' is insufficient." *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (quoting 3 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216 at 163 (2d ed. 1987). Dismissal is appropriate if the complaint lacks factual allegations regarding required elements necessary to obtain relief. *Id.* (citing 2A *Moore's Federal Practice* ¶ 12.07 [2.-5] at 12–19 (footnote omitted)). Additionally, in considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings. *See Scanlan*, 343 F.3d at 536–37.

*2. Summary Judgment*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552–53, 91 L. Ed. 2d 265 (1956). The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its

motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[3]  *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must come forward with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  The court must view all evidence in the light most favorable to the non-movant.  *See, e.g., Broussard v. Parish of Orleans*, 318 F.3d 644, 650 (5th Cir. 2003).

If the evidence would permit a reasonable fact finder to find in favor of the non-moving party, summary judgment should not be granted.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S. Ct. at 2512.  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  *See id.* at 255, 106 S. Ct. at 2513.

### 3. *Personal Jurisdiction*

A nonresident defendant, is subject to personal jurisdiction in this District if: (1) it is amenable to service of process under Texas's long-arm statute, and (2) the exercise of personal jurisdiction over the defendant is consistent with due process.  *See Stripling v. Jordan Prod. Co., L.L.C.*, 234 F.3d 863, 869 (5th Cir. 2000); *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992).  The Texas long-arm statute grants jurisdiction over a nonresident defendant "doing business"

---

[3]However, if the moving party "bears the burden of proof on an issues, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

in Texas. *See* TEX. CIV. PRAC. & REM. CODE § 17.042 (Vernon 1997). The phrase "doing business" has been interpreted to reach as far as the United States Constitution permits, and therefore the jurisdictional inquiry under the Texas long-arm statute collapses into a single due process inquiry. *See Ruston Gas Turbines, Inc. v. Donaldson* Co., 9 F.3d 415, 418 (5th Cir. 1993); *Williams v. Castro*, 21 F. Supp. 2d 691, 692 (S.D. Tex. 1998); *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356–57 (Tex. 1990).

Whether the exercise of personal jurisdiction over a defendant is consistent with the Due Process Clause of the United States Constitution likewise requires a two-pronged inquiry. First, the Court must conclude that the defendant has "minimum contacts" with the forum state. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945). Second, the Court must determine that requiring the defendant to litigate in this forum does not offend "traditional notions of fair play and substantial justice." *Id.*; *see also Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994); *Ruston Gas Turbines*, 9 F.3d at 418.

The "minimum contacts" prong can be satisfied by finding either general or specific jurisdiction over a defendant. *See Wilson*, 20 F.3d at 647. A defendant's contacts unrelated to the cause of action may confer general jurisdiction, but these contacts must be both "continuous and systematic" and "substantial." *Id.* at 647, 650–51. A defendant's limited contact with the forum state may support specific jurisdiction if such contacts give rise to the cause of action. *See Ruston Gas Turbines*, 9 F.3d at 419 ("A single act by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted."). Specific jurisdiction is proper if the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws."

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985) (citing *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239–40, 2 L. Ed. 2d 1283 (1958)). A defendant establishes minimum contacts by purposely engaging in conduct directed toward the forum state "such that [the defendant] should reasonably anticipate being haled into court there." *Id.* at 474, 105 S. Ct. at 2183 (citing *World-Wide Volkswagen Corp. v. Woodson*, 44 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 490 (1980)).

Generally, the plaintiff bears the burden of establishing the Court's jurisdiction over a nonresident defendant. *See Wilson*, 20 F.3d at 648. However, it is sufficient for the plaintiff to make a prima facie showing of jurisdiction, and any conflicts between affidavits are resolved in favor of the plaintiff. *See Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784, 785 (5th Cir. 1990); *Guyton v. Pronav Ship Mgmt., Inc.*, 139 F. Supp. 2d 815, 818 (S.D. Tex. 2001).

*B. Analysis*

Diamond Offshore contends that GulfMark and Do Brasil share common business departments, books, accounts, and expenses for purposes of making reports to their shareholders and disseminating information about profits to potential investors. Diamond Offshore alleges that GulfMark and Do Brasil have intermingled their finances, employees, and operations, and represent themselves to their investors and clients as a unified whole. Therefore, Diamond Offshore contends that GulfMark and Do Brasil constitute a single business entity, or that GulfMark constitutes Do Brasil's alter ego, and that, therefore, its claim against GulfMark is proper.[4]

---

[4]Diamond Offshore tends to treat its single business entity and alter ego theories interchangeably in its pleadings. The Court notes that "[t]he jurisprudence that informs the court's determination of whether the single business enterprise theory or alter ego liability is applicable contains similar factors." *Berry v. Lee*, 428 F. Supp. 2d 546, 554 (N.D. Tex. 2006).

Conversely, GulfMark and Do Brasil claim that Diamond Offshore cannot properly exercise personal jurisdiction over Do Brasil because GulfMark and Do Brasil are two separate companies, and Do Brasil is a Brazilian company that allegedly does not have sufficient minimum contacts with the United States to constitute this Court exercising jurisdiction.

The outcome of Diamond Offshore's contention that GulfMark is Do Brasil's alter ego or that the two entities are, in reality, a single corporate enterprise is determinative in this matter. If the Court finds there is an issue of material fact regarding this contention, then the Court may, at this point, exercise personal jurisdiction over Do Brasil through GulfMark. Furthermore, if the two are one, Diamond Offshore will have adequately stated a claim for which relief can be granted against GulfMark, and, if a factual issue exists, summary judgment will not be appropriate. Thus, the Court will first determine the viability of the alter ego/single business enterprise theory.

   *1. Alter Ego/Single Business Enterprise Theory*

"[T]he alter ego doctrine permits the imposition of liability upon the parent company for torts and contractual obligations of its subsidiary, where the parent exercises actual control over the subsidiary and operates it as a mere instrumentality or tool." *Miles v. Am. Telephone & Telegraph Co.*, 703 F.2d 193, 195 (5th Cir. 1983). Likewise, the alter ego theory provides a vehicle for bringing a subsidiary within the reach of the Texas long-arm statute because "a close relationship between a parent and its subsidiary may justify a finding that the parent 'does business' in a jurisdiction through the local activities of its subsidiaries," or vice versa. *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983) (citing *Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978)). The standard for alter ego jurisdiction is "less stringent" than the standard for alter ego liability because "'only a prima facie showing is required on a jurisdiction motion.'" *Id.* at 1161 (quoting 4 Wright & Miller,

12

*supra*, § 1068 at 250 (2d ed. 1987)).

The Supreme Court discussed whether the presence of a subsidiary in a forum may be imputed to its parent corporation in *Cannon Mfg. Co. v. Cadahy Packing Co.*:

> Through ownership of the entire capital stock and otherwise, the defendant dominates the Alabama corporation, [which does business in the forum state,] immediately and completely, and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals . . . . The existence of the Alabama company as a distinct corporate entity is, however, in all respects observed.

267 U.S. 333, 335, 45 S. Ct. 250, 251, 69 L. Ed. 634 (1925). The Supreme Court determined that the "corporate separation, though perhaps merely formal, was real," and, as such, the district court could not exercise personal jurisdiction over the defendant based upon its relationship with the Alabama company. *Id.* at 337, 45 S. Ct. at 251. The Fifth Circuit has interpreted *Cannon* as "stand[ing] for the proposition that so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983).

Thus, in order to determine if personal jurisdiction over Do Brasil through GulfMark is proper, the Court must "determine whether two separate and distinct corporate entities exist" by examining "[a]ll the relevant facts and circumstances surrounding the operations of the parent and subsidiary." *Id.* The factors the Fifth Circuit lists as being instructive in the evaluation of the totality of the circumstances are whether

> "(1) distinct and adequately capitalized financial units are incorporated and maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected, with each functioning in its own best interest; and (4) those with whom the corporations come in contact are apprised of their separate identity. Other factors deemed important by the commentators and Texas courts are: (1) common stock ownership; (2) the method and degree of financing of the subsidiary by the parent; (3) common directors or officers;

13

(4) separate books and accounts; (5) common business departments; (6) extent to which contracts between parent and subsidiary favor one over the other; and (7) connection of parent's employee, officer or director to subsidiary's tort or contract giving rise to suit."

*Id.* at 1162–63 (quoting *Miles*, 703 F.2d at 195–96 (citations omitted)).  The Court will now consider each factor in light of the facts of the instant case.

> a.  *Whether Distinct and Adequately Capitalized Financial Units Are Incorporated and Maintained*

Diamond Offshore contends that Do Brasil is not a financially independent operation and points to deposition testimony indicating that GulfMark provided the Limitada capital requirement for Do Brasil, insures Do Brasil's vessels, and provided the capital for the purchase of a construction vessel.  GulfMark concedes that it directly owned 63% of Do Brail and otherwise indirectly owned Do Brasil at the time of the allision.  The common way to become an owner is to infuse capital. Diamond Offshore must show that GulfMark exercised more control over Do Brasil than a normal parent, and there is no evidence in the Record indicating it is abnormal for a parent to provide at least some capital to its subsidiary.  If it did not provide such capital, it may be guilty of undercapitalizing, which *would* be relevant in the alter ego analysis. *Cf. Baker v. Raymond Int., Inc.* 656 F.2d 173, 179 (5th Cir. 1981) ("A parent corporation may be held liable for debts of a subsidiary if the parent fails to observe the formalities of separate incorporation, including adequate capitalization of the subsidiary.").

In response to Diamond Offshore's insurance allegations, GulfMark and Do Brasil claim that GulfMark does not handle the insuring of Do Brasil's vessels.  Rather, they claim that GulfMark names Do Brasil as an additional insured on its policies.  Both Parties cite the same deposition testimony for their contentions regarding insurance.  The Court has reviewed the testimony, and it

14

appears that the deponent was uncertain about whether Do Brasil was an additional insured or whether the Houston office provides the general liability coverage:

> Q: With regard to – and let me ask it a better way and a less coverage-decision-requiring way. Liability coverage that's purchased on behalf of the Brazilian company is purchased through Aon in their offices in Houston, Texas, by personnel for GulfMark Offshore, Inc., in Houston, Texas?
> A: Well, I mean, as far as the Brasil office goes, they may have general liability on their own behalf that they've purchased. As far as I know what you're saying, as far as them being named on – as additional insured on our policies, I'm – I'm fairly certain it's true; and we do place the general liability policies here is my understanding.
> Q: In fact, all of the insurance that's purchased for the Brazilian company would be purchased centrally, meaning that it would be purchased here in Houston, even if it's through a Brazilian broker, true?
> A: No, because I'm not sure what the insurance requirements would be and are in Brasil; and I would think that the majority of the insurances relating to the operations of the Brazilian company would be placed in Brasil. We basically protect the corporation.

(Streeter Dep. at 59.)  If GulfMark simply named Do Brasil as an additional insured to protect itself, such insurance would not be indicative of a single corporate enterprise or alter ego relationship. However, because Streeter was unsure whether GulfMark had purchased general liability insurance for Do Brasil, an issue of fact exists.  Because conflicts are resolved in favor of the plaintiff, the insurance issue weighs in favor of Diamond Offshore's alter ego/single corporate enterprise theory.

Diamond Offshore's next contention is that GulfMark provided capital for construction of a vessel.  GulfMark and Do Brasil claim GulfMark merely loaned the money to Do Brasil, and further assert that the loan was interest bearing, which suggests separation of corporate entities. *See Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 219 (5th Cir. 2000) (citing *Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174, 1188 (C.D. Cal. 1998)).  GulfMark and Do Brasil provided the Court with a copy of the "Advance Agreement," which requires Do Brasil to pay 10% interest on the loan. (Defs.' Reply

to Pl.'s Resp. to Mot. to Dismiss Ex. F ¶ 4.)  The Agreement is sufficient evidence that the provided

capital was an interest-bearing loan, which indicates that distinct financial units were maintained. *See*

*Alpine View Co.*, 205 F.3d at 219.  Thus, the vessel loan issue weighs against Diamond Offshore's

theory.

In sum, GulfMark's provision of the Limitada requirement does not bear significant  weight

in the analysis, GulfMark's alleged provision of insurance for Do Brasil weighs in favor of the alter

ego/single business enterprise theory, and the vessel loan, which is interest bearing, weighs against

the alter ego/single business enterprise theory.

### b.  *Whether the Daily Operations of the Two Corporations Are Separate*

Diamond Offshore argues that the two companies act as one big company with branches in

various locations.  Diamond Offshore presents the Court with financial status reports in which

GulfMark refers to Do Brasil as a "regional office."[5]  However, GulfMark and Do Brasil refer the

Court to a specific page on an exhibit to GulfMark's 10-K annual report that lists Do Brasil as one

of GulfMark's "subsidiaries."  Furthermore, both documents cited by Diamond Offshore, GulfMark's

10-K annual report and 10-Q quarterly report, contain identical introductory paragraphs that explicitly

state that "[u]nless otherwise indicated, references to 'we', 'us', 'our' and 'the company' refer to

GulfMark Offshore, Inc. and its subsidiaries." (Pl.'s Resp. to Def.'s Mot. Dismiss & Mot. Summ. J.

Ex. E at 3 & Ex. I at 6.)  If the Court were to view this evidence in a light most favorable to

---

[5]Diamond Offshore cites the Annual Report in totality for the proposition that GulfMark
refers to Do Brasil as one of its "regional offices." It also cites the Streeter Deposition, in which
Streeter was instructed to look at the last page of the Report to find the "regional office"
language.  The Court has perused the Report, which is 73 pages in length including the exhibits,
and cannot find the relevant page.  However, out of an abundance of caution, the Court will
assume that, at some point, the Report lists GulfMark as a regional office.

Defendants, it would determine that the reports do not portray GulfMark and Do Brasil as a single enterprise.  However, the Court must view the evidence in a light most favorable to the plaintiff.  It would not be unreasonable for the finder of fact to determine that the reports, which are abound with references to "us" and "we" and refer to the Brazilian office as a regional office, portray the two entities as part of a single corporate enterprise.

Next, Diamond Offshore contends that GulfMark's and its subsidiary's incomes are ultimately merged together, rather than each subsidiary's income being handled separately.  As evidence, Diamond Offshore points to the same financial reports, stating that the reports do not differentiate between GulfMark and Do Brasil.  GulfMark and Do Brasil assert that consolidating financial activities of a parent and its subsidiaries in financial reports is a standard business practice, and they present the Court with caselaw supporting this assertion. *See Calvert v. Huckins*, 875 F. Supp. 674, 678–79 (E.D. Cal. 1995) ("[C]onsolidating the activities of a subsidiary into the parent's annual reports is a common business practice.").  GulfMark and Do Brasil also refer the Court to 17 C.F.R. § 210.3, which provides general instructions for financial statements.  The Securities and Exchange Commission advises that "[t]here is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one entity directly or indirectly has a controlling financial interest in another entity." 17 C.F.R. § 210.3A-02 (2006).  Thus, GulfMark's filing consolidated financial statements is in accord with the Securities and Exchange Commission's instructions and  a common business practice.  Accordingly, such a practice does not lend support to Diamond Offshore's contention that GulfMark exercised  more control over Do Brasil than a normal parent corporation.

Diamond Offshore also offers GulfMark's website as evidence that the two companies are,

in reality, one corporate enterprise.  The website lists the vessels owned by GulfMark and its subsidiaries, including the OSV HIGHLAND WARRIOR, as part of "our fleet."  If a potential client is interested in the OSV HIGHLAND WARRIOR, the website instructs the customer to call Karen Rios, who is located in Houston.  GulfMark and Do Brasil contend that the Houston office involvement is inconsequential in the analysis.  They cite deposition testimony that indicates that if a potential customer calls Karen Rios, she merely gives them a password that allows said customer to gain access to additional vessel information on the website.  Then, "the person who has applied for a password is passed on to the appropriate subsidiary." (Streeter Dep. at 42–43.)  While acting as a go-between does not constitute substantial involvement in the daily operations of Do Brasil, it is involvement nonetheless.  Therefore, GulfMark's participation in Do Brasil's business via the website referral system supports Diamond Offshore's alter ego/single business enterprise theory.

    *c.  Formal Barriers Between Management of the Two Entities Are Erected, with Each Functioning in Its Own Best Interest*

        GulfMark and Do Brasil claim that Do Brasil has sole authority to hire and fire employees and set operational requirements for the OSV HIGHLAND WARRIOR.  They offer only Mario Madalena's Declaration as evidence of this claim.  If Diamond Offshore had offered any contradicting deposition testimony, the Court would, of course, draw all reasonable inferences in its favor.  Here, however, Diamond Offshore did not offer any evidence that Do Brasil does not have this sole authority.  Therefore, this evidence weighs slightly against Diamond Offshore's alter ego/single business enterprise theory.  However, many of the other factors in the alter ego analysis necessarily impact whether formal barriers were observed, and one could infer from the discussion below that the alleged barriers were nebulous.

*d.  Those with Whom the Corporation Comes in Contact Are Apprised of Their Separate Identities*

GulfMark and Do Brasil claim that GulfMark's annual reports and website reference Do Brasil as a subsidiary; thus, they contend customers are apprised of their separate identities.  As discussed above, Do Brasil is listed as a "subsidiary" on an exhibit to its Annual Report, and both its annual and quarterly reports indicate that first-person terminology will be used for GulfMark and its subsidiaries collectively.  Diamond Offshore counters that Do Brasil is listed as a "regional office" in the 2005 Annual Report.  Thus, there is a question of fact regarding whether the public would perceive these representations as indicative of a single corporate enterprise or two separate entities.

The Court now turns to whether GulfMark and Do Brasil represent the two companies as a single corporate enterprise on the Internet.  First, the Court reiterates that "information obtained from the Internet is 'inherently untrustworthy.'" *Barbour v. Head*, 178 F. Supp. 2d 758, 760 n.3 (S.D. Tex. 2001) (quoting *St. Clair v. Johnny's Oyster & Shrimp, Inc.*, 76 F. Supp. 2d 773, 774 (S.D. Tex. 1999)); *see also Perforaciones Maritimas Mexicana S.A. de C.V. v. Seacor Holdings, Inc.*, 443 F. Supp. 2d 825, 832 (S.D. Tex. 2006) (quoting the same language).  In *Seacor Holdings*, this Court found that "allegations on the Internet . . . are not enough to create a genuine issue of material fact regarding . . . ownership and corporate status." *Seacor Holdings*, 443 F. Supp. 2d at 832.  However, the Court notes that companies are increasingly utilizing the Internet as a marketing tool, and, as such, a thorough examination of the totality of circumstances entails an examination of the respective websites; however, any allegations contained on the websites are not, standing alone, enough to create a material fact regarding ownership. *See id.*

In the instant case, the Court has been presented with evidence regarding the allegations made

on GulfMark's website.[6]  Diamond Offshore claims that GulfMark represents itself as owning all of the vessels that are supposedly owned by its subsidiaries, including the OSV HIGHLAND WARRIOR.  The website refers to the vessels as "our vessels." (Pl.'s Resp. to Def.'s Mot. to Dismiss Ex. B.)  It lists Brazil as one of GulfMark's "areas of operation." And, Do Brasil is listed as a "regional office" on the 2005 Annual Report that was available on the website when Diamond Offshore printed the information for the Court.  Setting aside for a moment that this information is from the Internet, if one were to consider only this evidence, it would appear that Do Brasil is merely a regional office and that GulfMark and Do Brasil are indeed part of a single corporate enterprise.

Interestingly, GulfMark and Do Brasil first counter the evidence regarding GulfMark's website with allegations regarding the representations made on Diamond Offshore's website.  Such allegations are irrelevant.  GulfMark and Do Brasil present no evidence other than that already cited to negate the impact of GulfMark's Internet marketing upon the totality of the circumstances in the alter ego/single corporate enterprise analysis.  Thus, the Court finds that the website is evidence that GulfMark held itself and Do Brasil out to the public as a unified whole.[7]

---

[6]Neither Party presented the Court with any evidence that Do Brasil has an independent website.

[7]It is important to note that courts that have found corporate marketing indicative of an alter ego/single corporate enterprise status have not relied solely on the website.  For example, Diamond Offshore cites *Berry v. Lee* as an example of a case in which the district court, after considering the evidence as a whole, determined that the parent corporation exercised sufficient control over the subsidiaries to treat them as a single business enterprise. 428 F. Supp. 2d 546 (N.D. Tex. 2006).  The evidence in that case demonstrated that (1) the company's brochures, business cards, and websites referred to a single business entity with various local offices, rather than a separate corporate structure; (2) balance sheets prepared for potential investors failed to differentiate between the companies; (3) a response to a customer request indicated that the parent corporation "is the owner of" the alleged separate company; and (4) the parent company had the ability to exercise final control over the subsidiaries. *Id.* at 554–56.

In another case cited by Diamond Offshore, *Reul v. Sahara Hotel*, the district court

*e.  Common Stock Ownership*

GulfMark concedes that it is Do Brasil's parent company and that it held a 63% direct interest and otherwise indirectly owned Do Brasil at the time of the incident.  However, even 100% stock ownership and commonality of officers and directors does not alone establish an alter ego relationship. *See Hargrave*, 710 F.2d at 1160, 1162.  Rather, it is the degree of control by the parent over the subsidiary that is considered, and such control "must be greater than that normally associated with common ownership and directorship." *Id.* at 1160.  Thus, the Court will examine all of the facts to determine the extent to which GulfMark controlled its subsidiary rather than counting the number of shares it owned.

*f.  The Method and Degree of Financing of Subsidiary by the Parent*

The financial information presented in this case was discussed above in the section discussing whether Do Brasil was a distinct and adequately capitalized financial unit.  To reiterate, Diamond Offshore presented the Court with evidence that GulfMark gave Do Brasil the initial capital for establishing a Limitada and the capital needed to purchase a vessel.  The provision of the initial capital has a limited impact on this analysis.  And, regarding the vessel, GulfMark and Do Brasil presented the Court with evidence that said capital was given to Do Brasil in the form of an interest-

---

determined that the two businesses were "for all operational purposes one big, albeit well organized, corporation controlled from the top." 372 F. Supp. 995, 1000 ( 1974).  The company did not distinguish between the companies in its advertisements, had one slogan for all of the companies, had one trademark, and advertised in trade publications as one company with many branches nationwide.  Additionally, all of the alleged subsidiaries were called "'distribution centers'" in a company brochure, and both the parent and the alleged subsidiaries used this brochure, with the only differentiation between the alleged separate companies being a business card slot in which the local representative placed his or her card. *Id.* at 1001.  In the instant case, Diamond Offshore has not presented the Court with any such evidence.  Thus, while the website is evidence that GulfMark and Do Brasil failed to apprise their customers of their separate identities on GulfMark's website, this failure must be buttressed by significantly more evidence.

bearing loan and, as such, is more indicative of separate corporate entities than a single corporate entity. Thus, this factor does not weigh in favor of Diamond Offshore's alter ego/single corporate entity argument.

g.  *Common Directors or Officers*

Streeter testified that GulfMark and Do Brasil share no common officers or directors. (Streeter Dep. at 77.)  Madalena likewise declared that GulfMark and Do Brasil share no common executive directors or officers. (Defs.' Reply to Pl.'s Resp. to Mot. to Dismiss Ex. B ¶ 3.)  Diamond Offshore claims that (1) Streeter regularly monitored the financial information of GulfMark and all of its subsidiaries, including Do Brasil; (2) GulfMark's corporate officers regularly visited the offices of their Brazilian subsidiary; (3) GulfMark's executives received annual bonuses based on all GulfMark revenues combined, including those of Do Brasil; (4) senior management personnel in Houston were responsive to Do Brasil; and (5) Houston personnel were responsible for communicating with Do Brasil and routing clients to it when necessary. (Pl.'s Resp. to Def.'s Mot. to Dismiss 18–19.)  The Court will analyze each of these allegations in turn.

First, monitoring the financial information of one's subsidiaries necessarily impacts the parent corporation's finances and is thus integral to the basic duties of the parent corporation's Chief Operating Officer, in this case Streeter.  Such monitoring is not evidence that the parent corporation exercises greater control "than that normally associated with common ownership and directorship." *Hargrave*, 710 F.2d at 1160 (requiring greater than normal control to establish an alter ego relationship).  Second, the fact that GulfMark's corporate directors visit Do Brasil's offices does not necessarily imply that they exercise control over Do Brasil.  Streeter testified that parent corporations need to visit subsidiaries occasionally, and characterized the visits to Brazil as "fact-finding or

relationship type visit[s].'"[8] (Streeter Dep. at 68.)  Third, GulfMark and Do Brasil contend that paying corporate bonuses based on the net profits of subsidiaries is a common business practice.  Since GulfMark directly owned 63% of Do Brasil's stock, it is commonsensical that executive bonuses would be partially based on Do Brasil's profitability.  However, the Court is hesitant to declare that basing bonuses on the profits of subsidiaries is a common business practice without more evidence regarding all of the factors considered in awarding the bonuses.  Finally, having personnel who are responsible for communicating with, routing business to, and responsive to one's subsidiaries is logically a normal part of operating a parent corporation.  Thus, evidence in the Record indicating that GulfMark and Do Brasil share officers or directors is sparse.

### h.  Separate Book and Accounts

Diamond Offshore contends that "GulfMark's and its subsidiaries' incomes are ultimately merged together." (Pl.'s Resp. to Def.'s Mot. to Dismiss 18.)  First, in addition to the contention that Streeter monitors Do Brasil's financial information, Diamond Offshore claims that Do Brasil's profits and expenses are traced in the regular course of business by GulfMark's accounting and financial departments.  Streeter testified that GulfMark's Panamanian account is in New York.  He stated that the income earned by chartering vessels in Panama is placed in the Panamanian account and then allocated back to the vessel owning company according to the charter agreement with the vessel.  He further testified that, as far as he knows, an accountant in the Houston office is responsible for dividing the funds in the various accounts to the appropriate subsidiaries. (Streeter Dep. at 80–81.)

---

[8]In *United States v. Elgin, J.&E. Ry. Co.*, the Supreme Court, in an alter ego analysis, explained: "That a stockholder should show concern about the company's affairs, ask for reports, sometimes consult with its officers, give advice, and even object to proposed action is but the natural outcome of a relationship not inhibited by the commodities clause." 298 U.S. 492, 503–04, 56 S. Ct. 841, 844, 80 L. Ed. 1300 (1936).

GulfMark and Do Brasil, citing *Conner v. ContiCarriers*, claim that an "'intercompany' accounting system" is a common business practice. 944 S.W.2d 405, 419 (Tex. App.—Houston [14th Dist.], 1997). The *Conner* court lists several different facts, including the intercompany accounting system, that it considered in its determination that the separate corporate identities in that case were not "pure fiction." It did not find that such a system was a "common business practice"; rather, it found that, after considering the totality of the circumstances, the alter ego theory espoused in that case was not valid. *Id.* at 419–20. Here, the Court is unwilling to determine such an accounting practice is a common business practice because (1) it has been presented with no evidence for this assertion, and (2) it seems that handling the money of another, even if merely as a middle-man, carries with it some degree of control, and likely more control than is common for a parent corporation to exercise over its subsidiary. Thus, on this point, the scales tip in favor of Diamond Offshore's theory.

Diamond Offshore also contends that GulfMark's corporate tax director is responsible for considering what potential tax consequences GulfMark may experience as a result of the Brazilian operation. Reviewing the influence a subsidiary will have upon a parent corporation's taxes is an ordinary business responsibility because it directly impacts the parent corporation. However, Diamond Offshore additionally contends that GulfMark takes Do Brasil's expenses as a deduction in computing its net taxable income, which could be relevant. The following testimony is pertinent:

> Q: You would agree with me that GulfMark Offshore, Inc., for 2005 used the expenses incurred by the Brazilian subsidiary in reaching its net taxable income?
> A: I would say, yes. That would be my answer. I hope it's correct.

(Streeter Dep. at 64.) While the testimony is hardly definitive, the Court must make its inferences in favor of Diamond Offshore. However, claiming deductions based upon the subsidiary, especially when the parent corporation owns most of the subsidiary's stock, is not a strong indicator of abnormal

parental control.  In fact, the Fifth Circuit has stated that a parent corporations's sheltering "taxable income from a profitable subsidiary by offsetting it against losses from an unprofitable subsidiary" is a "common business practice." *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 207 (5th Cir. 1995). "The Internal Revenue Code allows a parent corporation to file consolidated income tax returns with its subsidiaries when the parent owns at least eighty percent of the subsidiary." *Id.*; 26 U.S.C. § 1501 ("An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns."); *see also Helvering v. Morgan's, Inc.*, 293 U.S. 121, 127, 55 S. Ct. 60, 63, (1934) ("After affiliation . . . the affiliated corporations, although filing consolidated returns, continued to be separate taxable units.  The consolidated returns operated only to unite them for the purpose of tax computation and the equitable apportionment between them of the tax thus computed."). *But see Sabine Towing & Transp. Co. v. Merit Ventures*, 575 F. Supp. 1442, 1447 (E.D. Tex. 1983) (citing § 1501 of the Internal Revenue Code and determining that filing consolidated returns is a "routine business practice," yet still finding that such filing "becomes another factor in proving the alter ego relationship").  Thus, while the Court has very limited information regarding the tax filings of GulfMark and Do Brasil, the simple fact that GulfMark took deductions based upon Do Brasil is of little probative value  in the complete alter ego/single business enterprise analysis.

Finally, Diamond Offshore contends that GulfMark's and Do Brasil's profits are merged together, and that the central accounting office in Houston divides the profits.  As discussed above, GulfMark and Do Brasil did not offer adequate rebuttal evidence to prohibit this allegation from tipping the scale in Diamond Offshore's favor.  Considering all of Diamond Offshore's contentions in this category, the Court finds that there is a question of fact with regard to whether GulfMark's and

Do Brasil's accounts are more intertwined than those of a normal parent and subsidiary.  As such, the Court finds that the accounts factor weighs in favor of the alter ego/single business enterprise theory.

*i. Common Business Departments*

The arguments Diamond Offshore asserts that relate to "common business departments" have been discussed under other headings above.  In sum, GulfMark's monitoring of Do Brasil's financial information is a common business practice, the lack of differentiation between GulfMark and Do Brasil on GulfMark's annual and quarterly reports and on the website, if viewed in the light most favorable to Diamond Offshore, supports its theory, and the theory regarding centralized accounting practices weighs in favor of the alter ego/single business enterprise theory.

Madalena declared that Do Brasil is responsible for its own hiring and firing and that the accounting books are separate.  Streeter declared that GulfMark maintains separate books of account, separate payroll systems, separate budgets, and separate bank accounts.  As previously discussed, Streeter's deposition testimony, if taken in a light most favorable to Diamond Offshore, rebuts the allegation that all accounting is separate.  Nevertheless, the Record does not contain any allegations by Diamond Offshore that the payroll systems, budgets, or personnel decisions, which are all essential tasks of a company's "business department," are intertwined.  Thus, with the limited information available, the Court finds that Diamond Offshore has not shown that GulfMark and Do Brasil have common business departments.

*j. Extent to Which Contracts Between Parent and Subsidiary Favor One Over the Other*

The Record only contains one contract between GulfMark and Do Brasil.  This contract was for a loan for the purchase of a vessel and has already been discussed.  The contract requires Do Brasil to pay 10% interest on the loan.  Thus, the contract does not favor one over the other.  This factor

does not support Diamond Brasil's alter ego/single business enterprise theory.

     *k.  Connection of Parent Corporation's Employee, Officer or Director to Subsidiary's Tort or Contract Giving Rise to the Suit*

     The allision between the MODU OCEAN WINNER and the OSV HIGHLAND WARRIOR occurred in waters offshore Brazil.  The OSV HIGHLAND WARRIOR was managed by Do Brasil and owned by Gulf Offshore North Sea.  GulfMark neither owned nor managed the OSV HIGHLAND WARRIOR, and it did not employ any of the seamen on the OSV HIGHLAND WARRIOR. Thus, GulfMark has no direct connection to the tort in question.  Therefore, this factor does not support the alter ego/single business enterprise theory.

     In sum, the facts weighing if favor of Diamond Offshore's alter ego theory are (1) GulfMark may have provided the Limitada capital requirement for Do Brasil; (2) GulfMark may have provided general liability coverage for Do Brasil; (3) GulfMark's website and financial reports could give the impression that the GulfMark and Do Brasil are a single corporate enterprise; (4) GulfMark directly owned 63% of Do Brasil  and otherwise indirectly owned it at the time of the allision; and (5) funds relating to the OSV HIGHLAND WARRIOR that are contained in a New York bank account may pass through GulfMark before being routed to Do Brasil.  The facts that are either neutral or almost insignificant in the analysis are (1)Streeter monitored the financial information of Do Brasil and all of its subsidiaries; (2) GulfMark's corporate officers regularly visited the Brazilian subsidiary; (3) management personnel in Houston responded to and communicated with Do Brasil; (4) personnel in Houston routed clients to Do Brasil; (5) GulfMark's accounting and financial departments tracked Do Brasil's profits and expenses; and (6) GulfMark took tax deductions based on Do Brasil. However, each of these facts could lead to an inference that the alleged formal corporate barriers were

nebulous.  The evidence that weighs against the alter ego/single corporate enterprise theory includes the following: (1) the funds submitted to Do Brasil for the purchase of a vessel were in the form of an interest-bearing loan; (2) Do Brasil has sole authority to hire and fire its own employees; and (3) GulfMark has no direct connection to the tort giving rise to this action.  These Motions present an extremely close question, and there are aspects of the analysis that favor GulfMark and Do Brasil's position.  But, on balance and overall, the Court is left with the conviction that it is proper to exercise jurisdiction over Do Brasil through GulfMark.  Hence, the Court, viewing the facts in a light most favorable to Diamond Offshore, finds that GulfMark and Do Brasil are, in reality, a single business enterprise.

Accordingly, because the Court unquestionably has jurisdiction over GulfMark, it may exercise jurisdiction over Do Brasil through GulfMark.  Thus, Do Brasil's Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED**.

*2.  GulfMark's Motion for Dismissal or Summary Judgment*

A Motion to Dismiss under Rule 12(b)(6) is viewed with disfavor and rarely granted.  In GulfMark's Motion for Dismissal pursuant to Rule 12(b)(6) and Motion for Summary Judgment, it asserts that it has never owned, operated, chartered, or managed the OSV HIGHLAND WARRIOR, and that, therefore, Diamond Offshore's Complaint does not allege facts supporting any of its causes of action against GulfMark.  However, Diamond Offshore referred to GulfMark and Do Brasil collectively in its Complaint, which alleges facts supporting a cause of action against Do Brasil.  Because the Court finds that GulfMark and Do Brasil are a single business enterprise and because it must view all well-pleaded allegations as true, the Court **DENIES** GulfMark's Motion to Dismiss pursuant to Rule 12(b)(6).

GulfMark additionally requests Summary Judgment.  The Summary Judgment standard requires the non-moving party to come forward with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P 12 (b)(6).  Here, GulfMark has alleged there is an absence of material fact with regard to GulfMark's liability for the incident.  GulfMark claims that its only relationship to the matter is that it is the parent corporation of Do Brasil.  "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *U.S. v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 1884, 141 L. Ed. 2d 43, 66 (1998) (citations omitted).  However,  because the Court has determined that the two corporations are, in reality, one corporate enterprise, GulfMark may be held liable for Do Brasil's actions.  GulfMark concedes that there a collision between the OSV HIGHLAND WARRIOR and the MODU OCEAN WINNER.  As such, there is a genuine issue for trial.  Therefore, GulfMark's Motion for Summary Judgment is **DENIED**.

## IV.  Forum non Conveniens

GulfMark and Do Brasil additionally request that the Court dismiss this action under the doctrine of *forum non conveniens*.  The doctrine of *forum non conveniens* derives from the proposition that "[i]n rare circumstances, federal courts can relinquish their jurisdiction in favor of another forum." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 722, 116 S. Ct. 1712, 1724, 135 L. Ed. 2d 1 (1996).  Pursuant to this doctrine, a court may dismiss a case in favor of a foreign forum if the defendant establishes that the convenience of the parties and the Court, coupled with the interests of justice, indicate that the lawsuit is better suited for adjudication elsewhere. *See Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir. 2001).

Federal courts employ a two-part analysis when applying the *forum non conveniens* doctrine.

29

*See Piper Aircraft v. Reyno*, 454 U.S. 235, 255–56, 102 S. Ct. 252,265–66, 70 L. Ed. 2d 419 (1981). The first step involves a determination of whether an adequate and available foreign forum exists. *See Sydow v. Acheson & Co.*, 81 F. Supp. 2d 758, 768 (S. D. Tex. 2000).  Next, if an adequate alternative forum is available, the court must decide whether "certain private and public interest factors weigh in favor of dismissal." *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 424 (5th Cir. 2001).  If the relevant private interest factors advocate dismissal, however, no inquiry into the public interest factors in needed.  *See Baris v. Sulpicio Lines*, 932 F.2d 1540, 1550–51 (5th Cir. 1991). While undertaking both steps of this analysis, courts must remain mindful that "the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient." *Piper Aircraft*, 454 U.S. at 256, 102 S. Ct. at 266; *see also Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 827 (5th Cir. 1986).  The "*forum non conveniens* determination is committed to the sound discretion of the trial court." *Piper Aircraft*, 454 U.S. at 266 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 511–12 (1947)).

The private factors to be considered in a *forum non conveniens* analysis relate to the convenience of the parties, and include: the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; possibility of viewing the premises, if such viewing would be appropriate to the action; other practical problems that make a trial of a case easy, expeditious, and inexpensive; enforceability of judgment; and whether the plaintiff has sought to vex, harass, or oppress the defendant. *See Karim,* 265 F.3d at 268 n.14 (citations omitted).  The "public interest" factors include: administrative difficulties; reasonableness of imposing jury duty on the people of the community; holding the trial in the view of those affected; and the local interest in having localized controversies

decided at home.  *See id.*

## A.  Adequate and Available Foreign Forum

Generally, an alternative forum is available to the plaintiff when the foreign court can assert jurisdiction over the litigation sought to be dismissed.  *See Piper*, 454 U.S. at 254 n.22, 102 S. Ct. at 265 n.22 (citation omitted) ("Ordinarily, [the requirement] will be satisfied when the defendant is amenable to process in the other jurisdiction.").  The alternative forum is adequate as long as the parties will be treated fairly and will not be deprived of all remedies there.  *See Sydow*, 81 F. Supp. 2d at 768; *see also Piper*, 454 U.S. at 254 n.22, 102 S. Ct. at 265 n.22.  Diamond Offshore argues that Brazil is not an adequate and available forum because GulfMark, an American company, has not stated that it will submit to jurisdiction in Brazil.  GulfMark and Do Brasil counter this argument with the assertion that GulfMark is not a proper party.  As discussed above, GulfMark is a proper party to this litigation under the alter ego/single corporate enterprise doctrine.  However, it is unclear whether a Brazilian court would make the same determination and accordingly assert jurisdiction over GulfMark.  Thus, GulfMark and Do Brasil have not shown that Brazil is an adequate and available forum.  Furthermore, even if Brazil were an adequate and available forum, the private and public interest factors weigh against dismissal.

## B.  Private and Public Interest Factors

The public and private factors must "clearly point" toward trial in an alternative forum being preferable to overcome the "strong presumption" in favor of the plaintiff's choice of forum.  *Piper*, 454 U.S. at 255, 102 S. Ct. at 265–66.  The first private interest factor involves the ease of access to the sources of proof.  GulfMark and Do Brasil argue that the MODU OCEAN WINNER is in Brazilian waters, is crewed by Brazilian nationals, and is managed from Diamond Offshore's

principal office in Brazil; likewise, the OSV HIGHLAND WARRIOR is manned by a Brazilian crew, was chartered by a Brazilian company, and was managed by Do Brasil, a Brazilian company. Additionally, according to GulfMark and Do Brasil, all of the witnesses are and will be located in Brazil and all of the documents are in Portuguese. Thus, GulfMark and Do Brasil argue that the parties will face numerous problems concerning access to the sources of proof if the case remains in Texas and that access to sources of proof for all parties would be much greater and considerably less costly if this case were litigated and tried in Brazil.

Diamond Offshore argues that GulfMark and Do Brasil are not separate entities and that GulfMark maintains detailed records of the operations of its alleged subsidiaries.[9] As discussed above, Streeter regularly monitored the financial information of Do Brasil, and the Houston office was responsible for dispersing funds from the New York bank account to Do Brasil for the services of the OSV HIGHLAND WARRIOR. Thus, there must be some records relating to Do Brasil in Houston, and it is doubtful that such records are in Portuguese.

GulfMark and Do Brasil next complain that the Brazilian witnesses are located beyond the reach of compulsory process and, as such, that the second private interest factor, availability of compulsory process for attendance of unwilling witnesses, weighs heavily in favor of dismissal. The Court cannot base its determination of this factor on a conclusory statement. GulfMark and Do Brasil have not presented the Court with any documentation regarding specific witnesses that may be beyond this Court's subpoena power, and it has not given the Court any indication of the essential testimony

---

[9] GulfMark and Do Brasil claim that GulfMark does not maintain records concerning Do Brasil's operations in Houston and interestinly cite the Madalena Declaration for this proposition. Madalena is the Administrative Manager for *Do Brasil*. If GulfMark and Do Brasil's allegation that the two are separate corporate entities were correct, then Madalena would not be qualified to make any assertions regarding what records *GulfMark* keeps.

that will be unavailable.  Furthermore, Do Brasil can compel the attendance of any Brazilian witnesses that are in its employ.

GulfMark and Do Brasil assert that, even if the Brazilian witnesses were willing to appear voluntarily, the costs of transporting and housing the witnesses will be very high and inconvenient. The Court agrees that such costs are high. *See Camejo v. Ocean Drilling & Exploration*, 838 F.2d 1374, 1381 (5th Cir. 1988) ("The cost of bringing Brazilian witnesses to Houston is very high."). However, since both Diamond Offshore and GulfMark are based in Houston, the Parties would have to incur the costs of transporting and housing the Parties should the case be tried in Brazil. Furthermore, not all of the Brazilian witnesses will be required to travel to Houston since the Court liberally construes Fed. R. Civ. P. 32 to allow depositions wherever convenient and "vigorously exercises its authority under Fed. R. Evid. 403 and 611(a) to ensure that each witness' testimony is as concise as possible and that cumulative and redundant testimony is kept to a minimum." *Continental Airlines*, 805 F. Supp. at 1397; *Dupre*, 810 F. Supp. at 827.  Therefore, the costs os transporting and housing the witnesses does not significantly impact this analysis.

The next factor involves the convenience of viewing the premises of the accident, if such a viewing is necessary.  GulfMark and Do Brasil claim that such a viewing "probably would be helpful." (Defs.' Am. Mot. to Dismiss 19.)  According to GulfMark and Do Brasil, both vessels are currently operating in Brazil.  Thus, if it is necessary to view the vessels, it would be more convenient if the litigation were in Brazil.  However, the Court finds it unlikely that a video or photographs detailing the damage would not be sufficient to prove damages.  Thus, while this factor weighs in favor of dismissal, its weight is not substantial.

While the private interest factors do not clearly favor retention, they also do not clearly point

33

to Brazil.  The decision to dismiss under the doctrine of *forum non conveniens* is left to the sound discretion of the trial court, and the Court finds that, while it is a close call, the private interest factors do not support dismissal.

The public interest factors require an inquiry into administrative difficulties, local interest in the matter, Brazilian interest in seeing the trial, and fairness of jury duty.  GulfMark and Do Brasil suggest that "this Honorable Court will be challenged with the complexity of the underlying property damage issues," and that, due to its busy docket, the Court "clearly need not handle" this dispute. (Defs.' Am. Mot. to Dismiss 20.)  However, because the Court has determined that GulfMark and Do Brasil are, in reality, a single corporate enterprise, the Court finds that there is significant local interest in seeing a dispute between two companies based in Houston resolved in Texas.  It follows, then, that calling the citizens of Galveston to serve on a jury to help settle this dispute will not be unfairly burdensome.  Furthermore, because the citizens of Texas have an interest in this matter, it is the Court's duty to untangle any complex legal issues it presents, and the Court will do so expeditiously—notwithstanding its busy docket.

The Court notes that the citizens of Brazil have an interest in this matter since the incident occurred in Brazilian waters.  However, such interest does not outweigh the other public interest factors.  Thus, the Court finds that GulfMark and Do Brasil have not overcome the presumption in favor of the plaintiff's choice of forum and accordingly **DENIES** Gulfmark and Do Brasil's Motion to Dismiss for Forum Non Conveniens.

## VI.  Conclusions

For the reasons stated above, Diamond Offshore's Motions to Strike the Streeter and Madalena Declarations are **GRANTED IN PART AND DENIED IN PART.**  GulfMark's Motion

to Dismiss Pursuant to Rule 12(b)(6) is **DENIED.**  GulfMark's Motion for Summary Judgment is **DENIED.**  Do Brasil's Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED.**  Do Brasil's Motions to Dismiss for Lack of Service and Forum Non Conveniens are **DENIED.**  Each  Party is to bear its own taxable costs, expenses, and attorney's fees incurred herein to date.

       **IT IS SO ORDERED.**

       **DONE** this 5th day of January, 2007, at Galveston, Texas.

Samuel B. Kent
United States District Judge